STATE *v.* CLENDENNEN.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

## ELIZABETH HALL et al. *v.* HILL, McLEAN & Co.

A mother, who resides in another State, where she is a competent witness for descendants, is not a competent witness for them in suits, in which they are interested, pending in this State.

A testator may so construct his will as to render it necessary to have recourse to some other document to explain it, and it is not essential that the document referred to should be probated; but the document must be clearly identified as the one to which the will refers.

Where the vendor remains in possession of the property sold, there is reason to presume the sale is simulated with respect to third persons.

APPEAL from the District Court of Morehouse, *Copley*, J.  *McGuire* and *Ray*, for plaintiffs, contended: That the judgment of the court below is correct, and should be affirmed.  The defendants moved to dissolve the injunction, on the grounds that there was no legal injunction bond signed by the plaintiff, a married woman; that the father and mother had no right to appear for their minor children; that the trustee alone could prosecute the suit, and he had not authorized it.

The injunction bond is signed by the agent and securities.  The evidence of the authority of the agent, *A. D. Peck*, to sign the bond, is the power of attorney, and we think it is conclusive; and even if the wife, the plaintiff, was not bound thereby, the securities are.  C. C. 3005.  And it is not pretended they are not good.  The father and mother are authorized to appear for their minor children in all civil acts.  C. C. 251, 267.  The will, at common law, vested the estate in *Mrs. Hall* during her life.  *Graves* v. *Hemken*, 12 R. R. 103.  And by that system of law, by naming a trustee, which is not required under our law, where the wife, as a person, has an existence.  The fact that more persons were made plaintiffs in the suit than was necessary, cannot prejudice the rights of the proper plaintiff: and there is no legal showing that the trustee did not authorize the suit.  Though this, we think, is immaterial, and that the court properly overruled the motion to dissolve the injunction.

On the merits, we think that full title is in *Elizabeth Hall*, the plaintiff, wife of *Dixon Hall, Jr.*, by the will of *Dixon Hall, Sr.*, dated October 1st, 1839, and duly probated November 1st, 1839.  By the 5th clause of that will, these slaves, and other property, were given to the plaintiffs.  As to its containing a substitution, these parties have nothing to do with it; the court in Alabama has given effect to it, and our courts will respect their decisions.  Should a case hereafter arise between the children and the mother, a different question might be presented, as in the case of *Harper* v. *Stansbury*, 2d Ann. 380.  But as the slaves were not named in the will, only by reference to the deed by which the testator

94

acquired them, defendants contend it is insufficient. We think the designation is sufficient. 1 Jarman on Wills, 83. *Habergeam* v. *Vincent*, 2 Vesey, Jr., 208. *Smart* v. *Prejean*, 6 Vesey, Jr. 565. The signature is proven by evidence of *McFee* and *Barham*, and the existence of such a trade between *Dixon Hall, Jr.*, and *Dixon Hall, Sr.*, is fully proven by the evidence of defendants' witness, *D. Jumper*, and that *Dixon, Sr.*, would not engage in a fraud; and by the evidence of *Hickman* and *Wallace*, who say it was generally understood that after the death of old *Mr. Hall*, the slaves belonged to the plaintiff and her children.

The defendants contend that these slaves never were delivered to *Dixon Hall, Sr.*, but continued in possession of *Dixon Hall, Jr.* The deed was dated March 5th, 1839, and contained a reservation of possession until the crop of that year was made. *Dixon Hall, Sr.*, died in October, 1839, before that time expired. The slaves are fully identified by the above witness, and by the evidence of *Barnes* and *Betsel*. We contend, further, that the court improperly rejected the evidence of *Amy Hall*, by whom we establish the identity of the slaves and their delivery, and the deed from *Dixon Hall, Jr.*, to *Dixon Hall, Sr.* If there is evidence that she is the grandmother of the children, she is then the mother-in-law of *Elizabeth Hall*, the plaintiff, and, for her, a competent witness. *Hamblin* v. *Hook*, 6 L. R. 74. *Groves* v *Steele*, 2d Ann, 482.

The evidence of *Jumper* proves the sale from *Dixon Hall, Jr.*, to *Dixon Hall, Sr.*; that it was in good faith, and $21,000 paid; and that *D. Hall, Sr.*, was a gentleman of high standing, and would not engage in a fraud. Also, *Powell* proves the ability to buy, &c.

*Betsell*, a witness, proves the slaves were brought to this State as the property of *Mrs Hall*, the plaintiff; that she furnished the funds for that purpose.

The evidence of the several witnesses clearly shows the slaves to have been in the possession of the plaintiffs before they came to this State, and until their seizure in this case, and that they never were in possession of *A. G. Hall*, only to bring to this State, and manage as agent of plaintiff.

The defendants attempt to show title in *A. G. Hall*, by a deed to him from *D. Hall, Jr.*, dated March 28th, 1848, and recorded October 28th, 1848. But *D. Hall, Jr.*, then, only held possession for his wife, and could give no title; and, in fact, only intended to give *A. G. Hall* the right to govern the slaves in Louisiana, where he was bringing them in advance of the owner, and *Mrs. Hall* never knew of the existence of such a deed. But if *A. G. Hall* could claim anything under that deed, he returned all right thereto, by deed to *D. Hall, Jr.*, duly recorded April 28th, 1849.

We think the evidence clearly shows that the sheriff did not seize the slaves in the possession of *A. G. Hall*, but in that of *Mrs. Hall*, the plaintiff, and in his return of May 30th, 1849, he does not say in whose possession they were, but that they were pointed out by counsel. The sheriff could not legally treat the recorded deed from *A. G. Hall* to *Dixon Hall, Jr.*, as a nullity, and seize the property, and no evidence has been adduced to show that this was a case in which he could do so.

The defendants, we suppose, for the purpose of trying to show they had a judicial mortgage on the slaves, as the property of *A. G. Hall*, introduced a certificate, to show the judgment of *Hill, McLean & Co.* v. *A. G. Hall* and *M. Walker*, was recorded April 26th, 1849. It is admitted that the April term of that court, 1849, did not terminate until April 29th, 1848. Judgments at that term had no effect until after the day of adjournment for the term. C. P. 555. The deed from *A. G. Hall* to *Dixon Hall, Jr.*, was recorded, and had effect that day.

The defendants offered witnesses to prove the signature to the deed from *D. Hall, Jr.*, to *A. G. Hall*, which plaintiffs objected to, on the ground that the defendants had taken the evidence of the subscribing witnesses to the deed, and theirs was the best evidence, which was overruled, and the evidence recorded, to which plaintiffs retained a bill of exception. That evidence, we think, is illegal, and should be rejected, and consequently that deed.

*Daniel Newton*, also, for plaintiffs.

*J. C. C. Sharp*, for defendants, contended: On the 26th April, 1849, *Hill McLean & Co.* obtained judgment in said court against *A. G. Hall* and *M. T. Walker*, *in solido*, for $1490. On the 28th May, following, execution issued and seven slaves were levied on as the property of *A. G. Hall*. On the 3d July, of the same year, *Elizabeth Hall* and her minor children, then residents

of Mississippi, enjoined the execution on the ground that the slaves belonged to them, and not to *A. G. Hall.* The simple question for the solution of the court, then, is, whether or not *Mrs. Elizabeth Hall* and her children are the owners of the slaves in controversy. By reference to the petition for injunction, it will be found that the suit is petitory in its nature, not possessory.

I. The title of *A. G. Hall,* our debtor, to the slaves, is good. The history of all the slaves in controversy except one, is this : We first find them in possession of *Dixon Hall, Jr.,* (the husband of *Mrs. Elizabeth Hall*) in 1839, in Lownds county, Alabama. In 1842 or 1843, *Dixon Hall, Jr.,* brought them to Madison county, Mississippi, where he continued to possess and act as owner of them until the 28th March, 1848. On the 28th March, 1848, *Dixon Hall, Jr.,* sold the slaves in controversy, together with several others, to his brother, *A. G. Hall,* our debtor. The deed was duly proven and recorded in Madison county, Mississippi, where it was executed, on the 13th April, 1848 ; and on the 28th October, of the same year, it was also recorded in the parish of Morehouse, the residence of *A. G. Hall.*

In conformity to the terms of this deed, the slaves were delivered to the vendee, *A. G Hall,* our debtor, who brought them to the parish of Morehouse; hired them out to various persons there, and, to all appearances, acted as the owner of said slaves up to the time of our seizure. From this statement it would appear that there could be no doubt about the title of our debtor, *A. G. Hall.* We show, 1st, a regular deed, recorded both in Mississippi and Louisiana; 2d, undisputed possession in him and his vendor, *Dixon Hall, Jr.,* as far back as we have any history of the slaves, to wit, 1839. This, then, is the evidence on which we rely to sustain our seizure.

Before asking the attention of the court to plaintiffs' title, we premise : that on the trial of the case, it was made to appear, that about the 29th March, 1849, *Dixon Hall, Jr.,* then a resident of Mississippi, was present in Morehouse, and that the slaves were reconveyed to him [not *Elizabeth Hall*] by *A. G. Hall ;* and there also appears to have been a kind of secret delivery to *Peck,* as the agent of *Mrs. Hall,* not to the vendee, *D. Hall, Jr.,* named in this deed.

To the introduction of this deed, defendants objected. We think the exception should have been sustained for the reasons there stated. The deed is irrelevant to the issue, for plaintiffs have declared on their own title, and not upon the title of *D. Hall.* It was calculated to take us by surprise, for it was not declared upon under the allegation, that the slaves were theirs; we could not foresee that they were *D. Hall's.* But, if admitted, we think it cannot benefit plaintiffs.

Now, we think it manifest that this pretended sale was a mere sham, a trick. 1st. Because the deed, even if genuine, was never recorded until the 28th of April, 1849, two days subsequent to the date on which our judgment was obtained and recorded. 2d. It was a mere simulation. It is doubtful if *D. Hall* was present when the deed was made, and it is certain that no money was paid. *Peck,* the other subscribing witness, thinks *D. Hall* was probably present, but he saw no money paid. It is certain there was no real delivery. *Peck,* the agent for *Mrs. Hall,* says: "When *Colonel Hall* came here in the spring of 1849, they were all delivered to me, by him, as the agent of plaintiffs, to hire out or to make such disposition as I saw fit." This was in March, 1849; he never was agent of *Mrs. Hall* until the 25th of June, 1849; and he says: "I never received any power of attorney from *Elizabeth Hall* until after the seizure, and this. is the only one, and it is of record." Now, how could the slaves have been delivered to him, as agent of *Mrs. Hall,* in March, 1849, when he never was agent until June ? Again, when cross-questioned in regard to the delivery of which he speaks, he says : "The negroes, some of them may have remained in my possession, when they were delivered, some longer and some shorter—some a few hours and some two or three days." If his statement be true, is this a delivery? If *Dixon Hall* was the owner of the slaves, as is pretended by the reconveyance from *A. G. Hall,* why are the negroes delivered to *Peck,* as the agent of *Mrs. Hall ?* And again, if *Peck* was the agent of *Mrs. Hall,* why does he take so much pains in having the deed from *A. G. Hall* to *Dixon Hall* recorded, &c.? The fact is, that this witness, *Peck,* was appointed agent for *Mrs. Hall* on the 25th of June, 1849, for the purpose of getting out this injunction, and his agency for her did not commence until then. We think this pretended delivery entirely fabulous, and certainly ought not to effect third persons. 3d. If this deed

HALL
v.
HILL.

proves anything, it shows title in *Dixon Hall* and not in *Elizabeth Hall*, the plaintiff in this case. But *Dixon Hall* joins his wife in this suit for the purpose of assisting her in enforcing her right, but does not set up any title whatever in himself, either under this pretended deed from *A. G. Hall*, or otherwise. How, then, can *Mrs. Hall* expect to derive any benefit from this deed, when the vendee himself, though a party to the suit, does not set it up? By joining his wife, as he has done, this title, if any, is tacitly abandoned. 4th. But suppose this title were all it purports to be, it could not benefit the plaintiffs in this case, because they are plaintiffs in a petitory action. We show that we came in possession of the slaves in good faith, and we had every reason to believe the slaves were *A. G. Hall's*, both from the records and his notorious possession. Plaintiffs must recover on the strength of their own title. Previous to issuing the execution, the records were examined to see if there had been any reconveyance from *A. G. Hall*, and none was found. We have been thus particular in the examination of this pretended conveyance to *D. Hall*, because much stress was laid on it in the lower court.

II. We come now to the examination of the title set up by plaintiffs. They claim the slaves by virtue of the 5th clause of the last will and testament of *Dixon Hall, Sr.*, who died in Autauga county, Alabama, in the fall of 1839. It is in these words: "5th. I give, devise and bequeath unto my son, *William T. Hall*, in trust for *Elizabeth Hall*, the wife of *Dixon Hall, Jr.*, and their children, now born, and those that may hereafter be born, during their lives, all the negroes embraced by name in a bill of sale made by *Dixon Hall, Jr.*, to me, some time in the month of March, 1839, &c. And the said property, as described in the bill of sale and the deed from *Dixon Hall, Jr.*, to me, for the land, is to be the property of the wife and children of the said *Dixon Hall ,Jr.*, to their sole and separate use; and if the said *Dixon Hall, Jr.*, shall die, and his wife marry again, then the whole of the property, both real and personal, shall be absolutely vested in the trustee aforesaid, for the children of the said *Dixon Hall, Jr.*, &c. &c."

It is manifest that it becomes important to ascertain. first, whether there ever was any real sale from *D. Hall, Jr.*, to the testator. The plaintiffs offered in evidence the document marked "B," and attempted, by the testimony of *Amy G. Hall*,—the mother of *D. Hall, Jr.*, and grandmother to some of the other plaintiffs,—to show that this is the identical document referred to by the testator. This testimony, however, was very properly excluded by the court, on our objection. There is, then, no evidence in the record to show that this is the deed and bill of sale referred to by the testator; there are circumstances which induce us to believe it is not, for the testator refers to an instrument in which land, negroes, provisions, &c., are conveyed, while the document "B" is a simple receipt for $20,000, as the consideration for some fifty slaves. But waiving this objection for the present, the document "B" is, of itself, no evidence of a sale, and the plaintiffs have furnished us with none other; while, on our part, we have shown that the testator never was, at any time, in the possession of the property; that *D. Hall, Jr.*, possessed and acted as owner of the slaves during the year 1839, and continued so to do, without interruption, until 1848, when he sold and delivered them to *A. G. Hall*. We solicit the attention of the court to the testimony of the following named witnesses, who resided in the neighborhood of the *Halls* in 1839 : *Dr. Wm. Burt*, *David Jumper*, and *Jesse Hickman's* answer to first cross-question; *Ephraim Wallace's* answer to twelfth interrogatory; *C. Powell's* answer to seventh interrogatory.

Now, if there is any credence whatever to be given to these numerous and respectable witnesses, it is positively certain that there never was any delivery whatever of the property. That it had continued for the space of ten years in the possession of the vendor, *D. Hall, Jr.*, just as it had done before 1839. The sale is, therefore, presumed to be fraudulent and simulated, and it devolved on those claiming under it to prove its reality. C. C. 1915, 2456. 3 L. R. 163. 3 N. S. 185. 17 L. R. 356. 2d Ann. 912.

Again: it appears that the parties, themselves, and all who have had any cognizance of the sale, have regarded it as a mere nullity; else, how are we to account for the conduct of *D. Hall, Jr.?* We find that he sold ten of the slaves to *Dr. Burt*, in Mississippi, and that he sold a large number to his brother, *A. G. Hall*, and warrants the title in the fullest manner. Are we to suppose him wilfully guilty of a fraud? How are we to account for the conduct of *Mrs. Hall?* It is pretty certain she was aware of the sale to *A.· G. Hall*, and it is equally certain she was present when he started with the slaves to this State. Are we also to suppose her a participant in this fraud? and, if so, who should be the sufferer? Story on Equity, sec. 385. 3 R. R. 332. 5 R, R. 518. Why was

not this document "B" produced at the probate of the will? Why were not the slaves inventoried as a portion of the succession of the testator? and why were they not administered on by his executors? Why has *Wm. T. Hall*, who is named as trustee for *Elizabeth Hall* and her children, never accepted the trust? We do not find that he has ever had anything to do with the property in any way, and now we may infer that his name is used in this suit without his knowledge.

Where has this document "B," deemed so important to the plaintiffs, been since the 5th March, 1839? We do not find that it was ever recorded, or that it, in any manner, ever made its appearance, either in Alabama, Mississippi, or in Louisiana, until it was produced in this suit.

Again: we think the slaves in controversy have not been identified with those alluded to in Alabama. Several of the witnesses state, that *D. Hall, Jr.*, brought slaves from Alabama to Mississippi, and that *A. G. Hall* brought them to Louisiana; but there is only one who had seen the slaves both in Alabama and Louisiana, and he says, in substance, that he knew them in Alabama, and saw them there last, in 1836 or 1837; that he had not seen them since, until he met with them here in October last; it had then been thirteen or fourteen years since he saw them. Now, by reference to the description given of the slaves by the plaintiffs themselves, and, also, by the sheriff who levied on them, it will be found that there are only two, except *Lewis*, whom he does not pretend to identify, over twelve years old, to wit, *Miles* twenty, and *Ann*, thirty. *Miles*, then, was six or seven years old when he saw him last,—and *Ann*, seventeen or eighteen. Now, is it probable he would recollect *Miles?* And how is it possible he should recollect those who were not born? How could he know that any of them were the children of *Ann?*

III. The 5th clause of the will, above quoted, is a substitution, and is, therefore, null, and can confer no title. On this point, we need only refer the court to the terms of the instrument, and the following authority. 4 L. R. 502. 2d Ann. 377. 4th Ann. 544. 1 R. R. 115.

We think, then, under no circumstances should the plaintiffs recover any of the slaves in controversy, and that the judgment of the lower court should be reversed, and one rendered in our favor, as prayed for in the answer.

In regard to one of the slaves, there can be no doubt the judgment of the lower court should be reversed. The plaintiffs have not even shown so much as paper title to him. We allude to the boy *Lewis*, who is described in plaintiffs' petition as fourteen years old, and, also, in the sheriff's return. He was four years old when plaintiffs pretend they acquired title to the other slaves; he is not named in document "B," nor the will; it is not pretended that he is the son of *Ann*, nor is he, in any manner, named by any of the witnesses, or identified with the Alabama slaves.

IV.—1. The will itself can confer no title. In order to make it effective, resort must be had to the "bill of sale" referred to by the testator. This would, in effect, make the bill of sale a part of the will, which is not allowed by law. 1 Jarman on Wills, 82, and cases cited. *Uterton, et al. v. Roberts, et al.* 28 Com. Law Rep. 379 *Chambers v. McDowel*, 6 Indale, 226. 7 U. S. Dig. 2 Vesey, Jr. 204. 6 Vesey, Jr., 565. Our bill of exceptions ought to have been sustained.

2d. The document B. of plaintiffs ought, at all events, to have been identified as the "bill of sale" of the testator. This was not done; it was attempted by the testimony of *Amy G. Hall*, which was excluded in the lower court.

3d. If the evidence of this witness is admitted, it cannot be credited; it is contradicted, in some instances, by the circumstances of the case, and in others, by several other witnesses.

4th. If document "B." is the identical "bill of sale" referred to by the testator, it ought to have been probated with the balance of the will. This was not done, and until it is, it can confer no title, on plaintiffs. 7 L. R. 45 10 L. R. 533.

The judgment of the court was pronounced by

ROST, J. *Elizabeth Hall*, and her husband, *Dixon Hall Jr.*, in right of the said *Elizabeth*, and of their common children, and *William T. Hall*, as trustee for their benefit, have enjoined the sale of certain slaves, taken under execution, as the property of *Alfred G. Hall*, at the suit of the defendants against him, on the ground that those slaves formerly belonged to *Dixon Hall, Sr.*, a citizen of the State of Alabama. who bequeathed them by his last will to *Wm.*

*T. Hall,* in trust for the parties now claiming them. They allege, that the tes-tator died in 1839, that the will was duly probated and the slaves delivered in execution of the devise, and that they never have parted with the title.

The defendants have pleaded the general issue, and denied that *Dixon Hall, Sr.* ever was the owner of the slaves; they aver that, at the time of the seizure, *Alfred G. Hall,* held the slaves, under a title from *Dixon Hall, Jr.,* to whom they originally belonged, which title was duly recorded in the parish of the domi-cil of the said *Alfred G. Hall.* They deny any transfer from *Dixon Hall, Jr.* to his father; aver that *Dixon Hall, Sr.* never was in possession of the slaves, and that if a title exists from his son to him, it is fraudulent and simulated. They pray for the dissolution of the injunction, with damages, and for general relief.

After hearing, the district court perpetuated the injunction, and the defendants appealed.

On the trial the plaintiff offered in evidence the testimony of *Amy Hall,* taken under commission, to prove the genuineness of the deed from *Dixon Hall, Jr.* to *Dixon Hall, Sr.,* and to identify the slaves named therein with those men-tioned in the will of *Dixon Hall, Sr.* and that they were delivered to *Elizabeth Hall,* which evidence was objected to by the defendants, on the ground that the witness was the mother of *Dixon Hall, Jr.,* and the grandmother of his children, and incomptent, as such, to testify in a suit in which they were parties. This objection was sustained by the court, and the plaintiffs took a bill of exceptions.

The ruling of the court is based upon an express provision of the code (C. C. 2260); it is no argument to say that the witness would be competent to testify for *Elizabeth Hall,* if she was alone in court, and that the evidence should there-fore have been received, so far as she is concerned. *Elizabeth Hall* has no dis-tinct interest in the property; she claims jointly with her children, and if they have any title, the title of both is the same, and as she has joined her children in the prosecution of the suit, the testimony which is inadmissable as to them, is equally so as to her. See *Guerin et al.* v. *Bagneries,* 13 L. R. 15. *Jedediah Leeds et al.* v. *John Caldwell et al.* 1 R. R. 256. The disposition of the will under which plaintiff claims title is as follows; "I give, devise and bequeath unto my son, *Wm. T. Hall,* in trust for *Elizabeth Hall,* the wife of *Dixon Hall, Jr.* and their children now born, and those that may hereafter be born during their lives, all the negroes embraced by name in a bill of sale made by *Dixon Hall, Jr.* to me, sometime in the month of March, 1839, and the said property, as described in the bill of sale from *Dixon Hall, Jr.* to me, is to be the property of the wife and children of the said *Dixon Hall, Jr.* to their sole and separate use; and if the said *Dixon Hall, Jr.* shall die, and his wife marry again, then the whole of the property shall be absolutely vested in the trustee, for the child-ren of the said *Dixon Hall, Jr.*"

It is in evidence, that after the death of *Dixon Hall, Sr.,* the will was duly probated and recorded, but no acceptance of the trust by the trustee, or actual delivery of the slaves has been shown. Without inquiring how far such a testamentary disposition would be recognized by our courts, in relation to the slaves mentioned in it, after their removal to Louisiana, we will assume that the parties, collectively, have alleged a legal title.

It has been urged, in behalf of the defendants, that the slaves bequeathed, should have been named in the will; that the reference to the bill of sale is vague and indefinite; and that the bequest is void for want of certainty; that if it is not, the sale referred to should have been annexed to the will, and probated as a part of it.

We are of opinion that a testator may so construct his disposition, as to render

it necessary to have recourse to some document, in order to elucidate or explain his intention, and that the document referred to, may be consulted for that purpose, and need not be probated as forming a part of the will.    Jarman on Wills. 82.    13 L. R. 17.    But whatever be the nature of the document referred to, it must be clearly identified as the instrument to which the will points.    The instrument adduced in evidence as being the one to which the testator had reference, is a receipt from *Dixon Hall, Jr.* to him, for twenty thousand dollars, in full for the slaves therein named, bearing date the 5th day of March, 1839; at the foot of the receipt is the following memorandum:    "I am to deliver the above named negroes to *Dixon Hall, Jr.*, as soon as I save my crop."    The defendants have expressly denied the identity of this document, with the one to which the testator had reference, and have alleged that if the identity should be shown, the instrument is fraudulent and simulated.    This document is a simple receipt, and not properly speaking, a deed of sale; there are no witnesses to it; its existence, at the time it bears date, is nowhere shown, and we are not informed in whose hands it has remained ever since; for aught that appears to the contrary, it may have been fabricated on the day it was produced in court, for the purposes of this suit.    To establish the identity, which it is incumbent upon the plaintiffs to show affirmatively, they rely on the testimony of *McFee, Barnham, Wallace, Hickman and Jumper*.    The two first proved the signature of *Dixon Hall, Jr.* to the receipt.    The testimony of *Wallace* is immaterial.    *Hickman* states that the negroes in question were originally in possession of *Dixon Hall, Jr.*, in the State of Alabama, and that he claimed them as owner; that in March, 1839, the witness thinks on the 9th of that month, *Dixon Hall, Jr.* conveyed all his slaves and all his property of every kind, to his father, by a bill of sale, and that *Dixon Hall, Sr.*, subsequently made his will and devised the property mentioned in said bill of sale, to the wife and children of *Dixon Hall, Jr.*    *Jumper* states, that sometime in March, 1839, he saw *Dixon Hall, Sr.*, on his way to his son's, *Dixon Hall, Jr.*; he told the witness that his object in going to his son was to buy his property; that his son had become involved, and that he had loaned and paid out $16,000 for him, and that he was going to purchase his property, to make himself safe.    A few days after this conversation, the witness saw him on his return from his son *Dixon*, and he then told witness, that he had purchased out *Dixon*, in toto; that he gave him, for his possessions, $21,000, including his negroes, mules, horses and stock of all descriptions, his land and household and kitchen furniture.    He further informed the witness, that his object was, not only to secure himself, but also to prevent his son's property from being sold to pay his security debts; that all of *Dixon's* own debts should be paid, but his property should not be sold to pay his security debts.

The instrument to which these witnesses refer, is one in which lands, stock, horses, mules, household and kitchen furniture, were included with slaves, and which must have been clothed with the formalities required for the alienation of real estate.    The consideration of it was twenty-one thousand dollars, not twenty thousand dollars, as the receipt states, and it bore date the 9th of March, while the receipt purports to have been executed on the 5th of that month.    It is sufficient to say, that this testimony does not prove, beyond all reasonable doubt, the identity of the receipt offered, with the bill of sale to which the will has reference.    Had the identity been proven, we are of opinion that the plea of simulation set up by the defendants, is fully sustained by the evidence.

It is shown that *Dixon Hall, Jr.*, was in possession of these slaves in the State of Alabama, as owner; and that he remained in possession, and acted as owner

HALL
*v.*
HILL.

ever afterwards, until he sold them to *Alfred G. Hall*, on the 28th day of March 1848. That he removed with them from Alabama to Mississippi, with all the slaves, which, it is pretended, his father bequeathed to his wife and children; that he sold ten of them to *Dr. Burt*, without any objection being made by the trustee, or *Elizabeth Hall*; and that, subsequently, he sold those, now in controversy, and others, to *Alfred G. Hall*, who removed them to the parish of Morehouse, in this State, to the knowledge of the plaintiffs, and without objection or hindrance from them.

One of the witnesses, who had the best opportunity of knowing, swore, that the transfer from *Dixon Hall, Jr.*, to his father, was unreal, and made for the purpose of defrauding the creditors of the vendor. Another witness states, that it was notorious in the neighborhood, that the sale was a sham. The character of those witnesses, for truth and veracity, is unimpeached. *Jumper*, the very witness upon whom the plaintiffs mainly rely, answers, as follows, one of the interrogatories put to him: "I was well acquainted with *Dixon Hall, Sr.*, and he was a man of high character and standing, and, I think, deservedly so; he was proud of property, and loved his children; and I do not believe that he thought this arrangement with his son, such a fraud as a father might not practice for his son; I do not think that *Dixon Hall, Sr.*, under ordinary circumstances, would be guilty of a fraud."

The impression produced upon our minds by this evidence, is directly the reverse of that which counsel intended to produce in offering it. We understand this witness to say, that *Dixon Hall, Sr.*, would not have been guilty of fraud, without a sufficient motive; but that he loved his children more than his good name, and thought it but right to assist them in defrauding their creditors, which the witness clearly intimates he had done in this instance.

It has been urged, that by the memorandum appended to the receipt offered in evidence, the slaves were not to be delivered till after the vendor had gathered his crop; and that, as his father died before that time, the want of actual delivery is not a badge of fraud. This reservation forms no exception to the disposition of article 2156 of the code. In all cases, when the thing sold remains in the possession of the seller, and he retains possession by a precarious title, as is the case here, there is reason to presume that the sale is simulated; and with respect to third persons, the parties must produce proof of their good faith, and establish the reality of the sale. This has not been done. The declarations of *Dixon Hall, Sr.*, made to *Jumper*, and offered in evidence by the plaintiffs, so far from proving the consideration of the sale, go far to show that it was unreal and simulated.

Had the witnesses in this case been examined in open court, the conclusions of the district judge would have had great weight with us, but as the testimony relating to the identity and simulation of the deed offered, was all taken under commission, we have had the same means which he had of passing upon its credibility, and more time to give to the examination of the case.

There is nothing before us to show that *Dixon Hall, Jr.*, ever parted with his title to the slaves, until he sold them to *Alfred G. Hall*, on the 28th of March, 1848. This sale was duly recorded in the State of Mississippi, and also in the parish of Morehouse, where *Alfred G. Hall* removed with the slaves. He was the owner of the slaves on the public records of the country, and in actual possession of them, when the defendants obtained and recorded their judgment.

The execution on this judgment issued on the 28th of May, 1849, and the slaves were seized on the 30th. It is in evidence, that on the 25th of March,

1849, *Alfred G. Hall* reconveyed the slaves to *Dixon Hall*, by a private act, which was recorded on the 28th of April, following; and the plaintiffs urged that this recording was notice to the defendants, and that after its date, they could not seize the slaves as the property of *A. G. Hall.* There is no evidence in the record, of the delivery of the slaves to *Dixon Hall,* under this sale; and the possession still continued in *Alfred G. Hall,* at the time of the seizure, under article 2156 of the code already cited, the legal presumption is, that the retransfer, without delivery of possession, was simulated; and it was incumbent upon the parties to it, to show its reality. This has not been attempted; so far from it, the evidence introduced by the plaintiffs, to show that the slaves had been all the time, and were at the time of the seizure, in the possession of *Elizabeth Hall,* and her property, is inconsistent with that hypothesis. We are, therefore, of opinion, that the seizure was properly made, and that the injunction must be dissolved.

It is therefore ordered, that the judgment in this case be reversed, the injunction dissolved, and the slaves seized subjected to the defendants execution. It is further ordered, that the plaintiffs, as principals, and *Alexander D. Peck, Bowles Billingsby,* and *Thomas N. Barnham,* as securities upon the injunction bond, be adjudged to pay the defendants, *in solido,* one hundred dollars damages. It is further ordered, that plaintiffs pay costs in both courts.